UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARY REFERMAT,

                Plaintiff,

   -against-

LANCASTER CENTRAL SCHOOL DISTRICT,

                Defendant.

Index No.: 14-cv-00712 (MJR)

## DECLARATION OF MARY REFERMAT

MARY REFERMAT, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declares and states:

1. I am the Plaintiff in the above-captioned action.

2. I make this Declaration in opposition to Lancaster Central School District's ("District") summary judgment motion seeking to dismiss my claims of age and gender discrimination, hostile work environment and retaliation. (See Defendant's Exhibit C, my amended complaint)

3. I base the following statements of fact based on my own personal experiences as I lived worked for the District for 33 years and lived through 8 years working under Robert Mowry, the District's transportation supervisor.

4. I am a 65 year old female.

5. I began working for the District in September of 1982 as a clerk typist.

6. I was a member of the Lancaster Association of Service Personnel, a union at the District, during my employment.

7. I was also a union representative during parts of my time with the District.

8. I initially started with the District working in the middle school as a clerk typist,

then went to the high school, in the attendance office and ultimately transferred to the transportation department in 2007 as a senior clerk typist.

9. I transferred to the transportation department because the position was a promotion from clerk typist to senior clerk typist.

10. As part of the transfer I did interview with Robert Mowry, who was the head of the transportation department, and he did recommend that I be hired.

11. I was the only senior clerk typist in the transportation department.

12. I reported directly to Mr. Mowry and he was my direct supervisor.

13. However, I was not Mr. Mowry's secretary, even though he treated me as if I was.

14. My primary job duty was payroll. I did not answer phones for Mr. Mowry and I was not tasked with managing his calendar.

15. I did answer the phones for the transportation department on occasion and I used the radio to communicate with drivers when needed.

16. For example, I answered calls from parents if their child left something on the bus and then would radio the drivers to check. I also assisted in distribution of the bus routes.

17. Initially, Mr. Mowry was friendly toward me. However, he soon realized that I, as an older, experienced female employee, was not like the other younger, less experienced, female office staff, who accepted Mr. Mowry's aggressive attitude and fit into his stereotype for what a female office worker should be and do.

18. Once I began pushing back against his early attempts to treat me like a secretary of old that would accept his harsh, boys club treatment and behavior, his attitude toward me changed.

19. Me, together with the other older, more experienced female employees, refused to

submit to Mr. Mowry's male dominant ego where he always had to be in control and would destroy any opposition through intimidation and other scare tactics.

20. Mr. Mowry treats female employees differently than he does the male employees.

21. Mr. Mowry speaks to women in a demeaning tone, he raises his voice with women and talks down to them.

22. His words are abusive and meant to make women feel subordinate to him in ways others than just that he was their boss.

23. There were instances where I would enter Mr. Mowry's office in my capacity as a union representative and he would yell at me that "I didn't tell you to come in her" and "you can go."

24. Mr. Mowry would also exclude me from meetings and tell me not to go, even though I later came to learn that these meetings were District-wide meetings that everyone was required to attend.

25. Mr. Mowry constantly criticized my work, often making me redo things four or five times, even though nothing was wrong with my original work.

26. Instead, it was Mr. Mowry who added new things for me to do each time even though the things he asked were not necessary.

27. On many occasions, Mr. Mowry would ask me, in the presence of others, what I was doing in a way that sounded like I did not know what I was doing or that what I was doing was wrong.

28. This occurred weekly, each payroll week, the entire time I worked for Mr. Mowry.

29. This was much more than just catching a mistake. He would often manufacture

mistakes or changes just to make me do the work again. He simply wanted to boss me around as his subordinate.

30. Mr. Mowry tried to sabotage my work by intentionally inputting errors into my payroll processing duties so that things would get screwed up.

31. For example, Mr. Mowry changed the times the drivers worked after the drivers inputted their times, without saying anything to me or the drivers. This would cause the payroll to be incorrect, which reflected poorly on me even though it was not my fault.

32. Mr. Mowry would tell me it was a waste of time when I tried to determine the cause of irregularities in timesheets. He told me it was a waste of time, but then would write memoranda stating it was me who made payroll errors.

33. Mr. Mowry often stood over me as I was working for long periods of time for no reason other than to harass and intimidate me.

34. He was not standing over me to check my work or corrected anything I was working on. He just lingered there to send the message that he could do whatever he wanted because he was a man and controlled what I could do.

35. It occurred so often I cannot put a number on it, and many of the other employees witnessed it and told me they felt sorry for me.

36. There was no purpose for him to stand over me at my desk as it was outside his office and he had his own office.

37. Mr. Mowry often told me, in the presence of others, that I did not even know how to do a task as simple as saving files on the computer.

38. In front of others, Mr. Mowry would always say things like, "don't bother, you're wasting your time" and that I was "useless."

39. Mr. Mowry referred to me by the pronoun "her," instead of by my name.

40. He intimidated me and yelled at me to correct my work after it was him who had agreed I could do the work the way I did it.

41. He did this in the presence of others to further degrade me.

42. I lived in constant fear of the next insult or demeaning demand.

43. Whenever I would question some direction from Mr. Mowry that seemed contrary to something I had been taught or even something he had said previously, he would say "I told you to do it, so do it."

44. These types of statements were made in the presence of others and were humiliating.

45. It was Mr. Mowry who constantly changed procedures or what he wanted me to do and then reprimanded me for making mistakes.

46. Even others recognized that Mr. Mowry did things, or did not do things that he said he would do, and then blame it on me.

47. Skip Skora confirmed that when he had requested a scheduling change from Mr. Mowry that it was Mr. Mowry who failed to make the change or tell me to do it, which then caused there to be a payroll issue that Mr. Mowry blamed me for.  (Sanders Exhibit 15)

48. This was all a pretext for his bias against women and his belief that as his "secretary" I should have just listened to what he said and not say anything.

49. My first complaint to Ms. Phillips was in December 2011 concerning the demeaning manner in which Mr. Mowry treated me concerning the way I did payroll.

50. At the time of my complaint, Ms. Phillips did not take it seriously, saying I was "tattling" on my boss, meaning Mr. Mowry.

51. After that complaint, Mr. Mowry told my union president that he was coming after me for "stirring the pot."

52. This was confirmed by Ms. Pautler, who in her discrimination complaint confirmed that Mr. Mowry told Cheryl Peck, the union president, that he was going after me for "stirring the pot." (Sanders Exhibit 5, Section 8)

53. After my complaints, Mr. Mowry instructed me not to speak to administration staff on multiple occasions.

54. He was trying to send a message that even though I complained, there was nothing that was going to come from it and he would continue to act that way toward me.

55. In October 2012, Mr. Mowry instructed another employee, Gina Scaglione, to not speak with me and to not come into the office anymore. He constantly made those statements to Ms. Scaglione and I.

56. While meeting with Ms. Scaglione on a union issue, Mr. Mowry yelled "I didn't tell you to come in here, you can go, I don't want you."

57. He did not like that Ms. Scaglione and I talked because he was paranoid that we were complaining about him.

58. I complained directly to Mr. Mowry and to Ms. Phillips verbally throughout 2012 about his harassing treatment, including in October 2012 about Mr. Mowry's harassment of both me and Ms. Scaglione.

59. After that, in late 2012 or early 2013, Mr. Mowry forced me to work in the mechanic's garage as opposed to the transportation office, where I had worked from the time I was transferred until 2013, for part and then most of my day. [He did this to keep me away from Ms. Scaglione.]

6

60. My work location used to be up front in a formal office setting.

61. The garage was not an office. There were fumes in the garage from all of the buses and the exhaust fan that was supposed to mitigate the fumes did not work.

62. I was told that I could wear a mask for the fumes, but the masks that the District provided were large, bulky masks that made it impossible to communicate. (Exhibit 1)

63. Also, the noise level was so high it was difficult to concentrate.

64. Moreover, my desk in the garage was just seven feet from the men's restroom with a direct sightline. (Exhibit 2). The door to the men's restroom was never closed.

65. I was the only office staff in the garage and the only woman who worked in the garage.

66. At first I was issued men's coveralls to wear, which I did. Later, I wore a smock just so I would not ruin my office clothes.

67. There was zero reason for me, as the Senior Clerk Typist, who did payroll, to be in the bus garage.

68. According to Paul Bannochie, who was the head mechanic at the District, the decision to move me into the garage was "pure harassment," and the "shop is not a typical office setting or working environment for a female." (Sanders Exhibit 14)

69. He also identified that the bathroom was a men's bathroom that was in constant use.

70. I complained about the transfer to the garage from the outset and the conditions in the garage to Jamie Phillips, the Assistant Superintendent for Business, but nothing was done.

71. After my complaints, from the period of February 15, 2013 to April 4, 2013, all of a sudden Mr. Mowry decided I was not performing my job well and served me with six

7

memoranda regarding "payroll," which was my primary job function.

72. In June 2013, Mr. Mowry grabbed my hand, while it was on my computer mouse, and took over my operation of my computer in order to do things on my computer.

73. He did this to exert his dominance over me.

74. He had zero patience for me and saw me as an annoyance that he had to handle.

75. On multiple occasions in 2013, I would come into work and notice my computer and my desk drawers were moved from their previous spot.

76. My computer screen would be turned so that it was facing the ground.

77. My desk drawers were also opened and paperwork was moved around or removed.  Mr. Mowry would then ask me for the missing paperwork loudly, in front of others, just to make me look bad and embarrass me in front of others.

78. Mr. Mowry would have been the only person who would have done this, and he would have done this just to show me he could.

79. I know that nobody else would have done this because they were not the boss and could have gotten in trouble, but Mr. Mowry acted as though he could do whatever he wanted to me, and did.

80. I complained to Ms. Phillips again in person on April 9, 2013 about a hostile work environment caused by Mr. Mowry.

81. Ms. Phillips acknowledged my complaint concerned a hostile work environment. (Exhibit 3)

82. The very next day, Mr. Mowry, in the presence of others, stated loudly that he knew I had complained to Ms. Phillips about the memo.

83. He said twice, in the presence of others, "when you met with Jamie," meaning

Ms. Phillips, in such a way that it was mocking and intimidating toward me.

84. And after that complaint to Ms. Phillips, Mr. Mowry increased the number of memoranda he issued to me, memoranda I never received before I first reached out to Ms. Phillips about Mr. Mowry creating a hostile work environment.

85. I filed a charge of discrimination and harassment based on age and gender and retaliation for complaining about discrimination and harassment with the Equal Employment Opportunity Commission and the New York State Division of Human Rights on or about June 27, 2013. (Defendant's Exhibit F)

86. On November 20, 2013, the day after I raised concerns about Mr. Mowry's treatment of me at a labor management meeting, I received a note from Mr. Mowry telling me that I could no longer have plants in the office. (Exhibit 4)

87. Mr. Mowry had an indoor tree in his office.

88. Mr. Mowry also left me a note instructing me to "see [him] before calling any vendor for assistance" after I had called Bus Sales, Incorporated as part of my job duties. (Exhibit 5). Mr. Mowry did not want me to perform any higher level function because I was a woman.

89. Greg Phillips, the head mechanic, whom I shared the office with in the garage, told me in December 2013 that Mr. Mowry told him to find more work for me to do in the garage.

90. Mr. Mowry changed my work schedule so that I had to spend even more time working out of the garage, which was such a miserable place to work that no other clerk had to work out of during my entire time with the District.

91. He did this so that I would have to be in the garage even longer in retaliation for

9

my complaints.

92. I updated my EEOC charge on January 21, 2014 to include this and other harassing and retaliatory action by Mr. Mowry. (Exhibit 6)

93. On January 23, 2014, Mr. Mowry presented me with a disciplinary notice, which I refused to sign until I could go over it with my attorney. (Exhibit 7)

94. According to the disciplinary notice, his direction on November 14, 2013 was that I was supposed to "meet" with him prior to making any corrections or adjustments in the next payroll. (Exhibit 7)

95. That is not what the memo stated. It clearly states "All corrections or adjustments will be discussed with me prior to sending for adjustments to the next payroll." (Exhibit 8)

96. I did discuss it with him. He never asked me to meet with him, neither in writing or orally.

97. Moreover, he knew that I would not meet with him without a union representative present, which he responded during the January 23, 2014 meeting by yelling "you will meet with me when I want you to, union rep or not."

98. I told Mr. Mowry that I thought this notice and his contention that I was refusing was further harassment.

99. When I refused, in the presence of others, and in complete disregard, he yelled at me to get out and forced me out into the cold without a winter jacket just because I began to refuse his demands.

100. I reported this to Jamie Phillips, but she did nothing about it.

101. I also reported this to the EEOC. (Exhibit 9)

102. Before that, I never had any concerns raised to me about my behavior at work.

103. It was not a coincidence that Mr. Mowry accused me of insubordination after I complained about his harassment.

104. And on March 5, 2014, Mr. Mowry, in the presence of others, stated loudly, "I contacted Jill Santoro and she will be happy to show you how to save a file because you don't know how."

105. I had been working in my position for a number of years without anyone complaining that I did not know how to save a file. I did.

106. Mr. Mowry just wanted to belittle me in front of everyone else.

107. Mr. Mowry also made comments that I did not know how to move files on a computer on several occasions.

108. On one occasion in March or April 2014, Mr. Mowry asked me if I had spoken to the IT employee about training on saving a file. I told him no. Minutes later, Mr. Mowry asked if I was sure that IT did not contact me about how to save files and then said, "because you don't know how, remember."

109. He made these comments in front of others and for no justifiable reason.

110. These comments were embarrassing to me and only meant humiliate me in front of others.

111. On the same day Mr. Mowry made the embarrassing comments, he opened a personal letter, marked confidential, that was sent to me concerning my request for FMLA leave.

112. Mr. Mowry's behavior also caused others to treat me and the other women who made complaints about him in the same way he did.

113. Thereafter, in April 2014, a Buffalo News article ran concerning the complaints that I and many other women made against Mr. Mowry. (Exhibit 10)

114.   After the article ran, in the office, I was informed of and saw a copy of the newspaper article, which had my picture on it, in the mechanics breakroom, was written on and my face was defaced with horns on my head.

115.   Two employees saw the article in the mechanics breakroom with my face defaced.  (Exhibit 11; Exhibit 12)

116.   Also in April 2014, when Ms. Scaglione came into the office to speak with me, she was thrown out of the office and told she could not be in there and could not speak with me.

117.   This occurred constantly over the course of three years.

118.   Mr. Mowry isolated me from everyone else by closing the blinds in the office so that people could not see me and therefore prevented them from communicating with me and me with them.

119.   Then in May 2014, I had a complaint made against me by one of Mr. Mowry's friends in the transportation department that I was creating a hostile work environment.  I refused to be harassed any longer and complained, and as a result, Mr. Mowry got one of his friends to make a complaint against me.

120.   I complained to the District's attorney, by letter from my attorney dated May 9, 2014, and to Ms. Phillips about this behavior, which occurred after I filed my EEOC Charge. (Exhibit 13)

121.   I also made several other complaints about Mr. Mowry's actions toward me over the course of my employment.

122.   Mr. Mowry moved me to the garage, but he demeaned me even more by instructing me to do work on the truck bay floor.  As in, he wanted me to sit on the truck bay floor.

123. In August 2014, Mr. Mowry instructed me to shred a large amount of documents in the truck bay.

124. The truck bay had greasy floors and was not an office setting.

125. No other employees were ever asked to do their work in the truck bay.

126. I complained about this as harassment and retaliation to Ms. Phillips on August 5, 2014. (Exhibit 14)

127. In early 2015, Mr. Mowry even had all transportation department calls forwarded to my work phone. He acted as though I was his secretary and that I, as a woman, should be handling all the phone calls everyone received.

128. Then, in February 2015, on a day when school was cancelled due to weather, Mr. Mowry did not call me into work even though on previous days where school was cancelled I was still called to come into work. Everyone else in the transportation department was allowed to come into work that day.

129. There was a district-wide staff development day that was intended to include all district and transportation department staff scheduled for March 20, 2015. On the morning of March 20, 2015 when I arrived to work there was a note left on my desk that stated "Mary, not required to attend-all drivers will," from Mr. Mowry.

130. Mr. Mowry did not instruct anyone else not to attend and there was no justifiable reason for excluding me from the district-wide development day.

131. That was the last straw for me because it became all too clear that even the District, specifically, Jamie Phillips, who had sent the memorandum for development day, allowed Mr. Mowry to continue to single me out.

132. I retired from my employment with the District effective April 8, 2015 and

notified the District of my resignation by letter dated March 26, 2015. (Exhibit 15)

133. I was required by contract to give notice before the effective date of my retirement. However, I did not work past March 26, 2015, I used my unused vacation time.

134. I came to realize that the treatment would never change and the District was not going to do anything to stop it in later 2014. I did not want to leave the District and did not have plans to retire, but I felt hopeless, that I had no other choice and was forced into it due to Mr. Mowry's increasingly harassing behavior.

135. I began applying with Southwest Airlines in December 2014.

136. Many other female employees who worked underneath Mr. Mowry also filed complaints against him, including Laura Lee Pautler, Mary Juliano, Gina Scaglione, Deborah Bak, Debbie Flowers, Darlene Sherwood and Karen Shafer.

137. In fact, Laura Lee Pautler and Karen Shafer had to retire due to the harassment they suffered from Mr. Mowry.

138. After I retired, Judy Feldmeyer, who was the head driver in dispatch and worked in the office when I worked at the District, made a complaint about Mr. Mowry harassing her.

139. Ms. Feldmeyer was referred to by others as being the new "Mary," and she stated herself "I am the new Mary in the office," meaning that she was the one in the office that Mr. Mowry harassed instead of me after I left.

140. After Mr. Mowry retired in 2016, Ms. Feldmeyer became the new transportation supervisor.

141. For the foregoing reasons and the reasons stated in Plaintiff's response to Defendant's Statement of Undisputed Fact and stated in Plaintiff's Memorandum of Law, Defendant's summary judgment motion should be denied.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  Cheektowaga, NY
              July 6, 2017

s/Mary Refermat
Mary Refermat